UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JOSEPH SIMPSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:13-cv-00791-RLY-TAB |
| | ) | |
| CITY OF INDIANAPOLIS and ANDREW MCKALIPS, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

On June 3, 2012, Plaintiff, Joseph Simpson, saw that several police officers were outside of a house on his street. He knew that a young boy lived in the house with his grandmother, and believed that the boy was home alone at the time. He wanted to check on the boy, so he walked over to the neighbor's house. The police officers at the home explained that they were investigating a reported burglary in progress and needed Simpson to leave the crime scene. Before making his way back home, Simpson called out to the boy twice and then argued with an officer. During this encounter, officers ordered him to leave and threatened him with arrest several times. An officer ultimately came up behind Simpson and attempted to perform an arrest. Simpson initially snatched his hand away, but then submitted to the arrest. He was ultimately charged with refusing to leave the scene of an emergency incident area and resisting law enforcement. At trial, the first charge was dismissed and he was found not guilty of the second.

Simpson filed this lawsuit against Defendants, the City of Indianapolis and Officer Andrew McKalips, to redress what he believes was an unlawful arrest and prosecution. Defendants now move for summary judgment. For the reasons set forth below, the court **GRANTS** Defendants' motion.

## I. Background

On June 3, 2012, at approximately 5:40 p.m., M.S., a fourteen-year-old boy who was home alone, called 911. (Filing No. 88-1, Computer-Aided Dispatch ("CAD") Report at 1; Filing No. 88-2, Deposition of M.S. 11:21-25, 12:8-10; Filing No. 88-3, 911 Audio, Tracks 1, 2). He reported that five males were trying to break into his home through a window. (911 Audio, Track 2).

Several officers with the Indianapolis Metropolitan Police Department ("IMPD") were dispatched to investigate the reported burglary in progress. (CAD Report at 1; 911 Audio, Track 6; Filing No. 88-4, Probable Cause Affidavit ("PC Aff.") at 1). When the officers arrived at the scene, Officer McKalips stopped two juveniles in front of the home for questioning while two other officers walked around the perimeter of the house to look for signs of forced entry. (PC Aff. at 1). A fourth officer subsequently arrived at the scene to assist. (*Id.*). M.S., who was hiding in the basement, was still on the phone with the 911 operator. (911 Audio, Track 2). After the officers completed a perimeter check, they asked the 911 operator to have the boy come to the door. (*Id.* at Track 6). The 911 operator told M.S. that it was safe for him to go to the door, but he was too scared to do so. (*Id.* at Track 2).

While the officers were investigating the situation, Simpson, who happened to live across the street and a few houses down, saw the police officers and decided to walk over so that he could check on M.S. (Filing No. 88-5, Deposition of Joseph Simpson 55:15-18, 56:16-57:1; Filing No. 95-1, Affidavit of Joseph Simpson ¶ 1). He approached the house by walking up a paved path that led from the public sidewalk up to the home's front porch. (Simpson Aff. ¶ 11). He stopped at the end of the path at the bottom of the steps to the front porch. (Simpson Dep. 69:19-24). Officers at the front door told Simpson that they were investigating a burglary in progress. (*Id.* 70:1-2). He replied that M.S. was inside the home and that he could help them get the boy to come outside. (*Id.* 70:3-6). The officers responded that Simpson needed to leave the area because it was a crime scene at that point. (*Id.* 70:6-8). Simpson said he just wanted to help. (*Id.* 70:8-9). The officers declined his offer to help and reiterated that it was a crime scene. (*Id.* 70:9). Simpson testified that during this exchange, the officers told him "that it was a crime scene and to leave" two times. (*Id.* 74:21-23).

Simpson began walking back down the path toward the public sidewalk when he noticed that one of the home's windows was open. (Simpson Aff. ¶¶ 15-16). He knew that the open window was in M.S.' bedroom, so, as he was walking, he "called out" to the boy and said, "Melvin, open the door." (*Id.* ¶ 16; Simpson Dep. 77:1-6). Simpson then continued moving away from the home. (Simpson Dep. 78:3-7).

M.S. was finally persuaded by the 911 operator that it was safe to meet the police at the door. (911 Audio, Track 4). He subsequently opened the door for the officers. (*Id.*). By that time, Simpson had moved away from the house under investigation and

was standing on the sidewalk in front of the adjacent property. (Simpson Dep. 78:3-13). He saw the police go into the house and, shortly thereafter, come back out onto the front porch with M.S. (*Id.* 78:10-13). Simpson again "called out" to the boy, asking "was he okay and did he get ahold of his grandmother." (*Id.* 78:14-15; Simpson Aff. ¶ 20).

Officer McKalips yelled to Simpson that he "need[ed] to keep moving" because he had "been asked to leave the crime scene." (Simpson Dep. 80:15-19). Officer McKalips added, "[I]f you don't leave, I will arrest you." (Simpson Aff. ¶ 20). Simpson responded "that he had left the scene, and that he was nowhere near the scene." (*Id.* ¶ 21). Officer McKalips then explained that Simpson needed to do two specific things: (1) get 150 feet away from the emergency area, and (2) get inside his house. (Simpson Dep. 82:16-20). He again added that if Simpson did not comply, he would be arrested. (Simpson Aff. ¶ 22). Simpson retorted that moving 150 feet away from the area would require him to walk past his own house–he would be "standing outside in the alley somewhere." (Simpson Dep. 82:21-23). He told Officer McKalips that he was "a City-County Council person," and therefore understood "what police do." (*Id.* 83:25-84:1). He also emphasized that he was 61 years old, a property owner, and a taxpayer, that he paid Officer McKalips' salary, and that he was standing on public property at the time. (*Id.* 83:21-24, 93:22-94:12).

Officer McKalips stated, "Well, if you don't continue, I'm going to arrest you." (*Id.* 84:3-4). Simpson replied, "For what? I am – I'm moving, I ain't doing anything." (*Id.* 89:23-90:2). Simpson crossed the street and was standing on the sidewalk in front of his house when he heard his daughter, who had been outside watching the events unfold,

4

say, "Daddy, turn around, he's got a Taser on you." (*Id.* 84:6-16; Simpson Aff. ¶ 29). As Simpson started to turn around, he felt his hand being grabbed from behind. (Simpson Dep. 84:20-21). He "snatch[ed] it back." (*Id.* 84:22). He then heard Officer McKalips say, "You're under arrest." (*Id.* 84:22-23). Simpson turned and saw Officer McKalips pointing a Taser at him. (*Id.* 84:25-85:1). He subsequently turned back around, put his hands behind his back, and allowed Officer McKalips to handcuff him. (*Id.* 85:3-7). Simpson was arrested and transported from the scene. (Simpson Aff. ¶ 38).

Officer McKalips prepared a probable cause affidavit. (*See* P.C. Aff.). Based on that affidavit, a special prosecutor charged Simpson with (1) refusing to leave the scene of an emergency incident area, and (2) resisting law enforcement, both as misdemeanors. *See State v. Simpson*, No. 49F07-1206-CM-037394 (Marion Super. Ct. 2012). On November 19, 2012, the Marion Superior Court dismissed Count 1 and, after a bench trial, found Simpson not guilty on Count 2. *Id.* This lawsuit ensued.

## II. Legal Standard

"Summary judgment is proper where, construing facts and drawing inferences in the light most favorable to the non-moving party, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Novoselsky v. Brown*, 822 F.3d 342, 348-49 (7th Cir. 2016) (quoting Fed. R. Civ. P. 56(a)).

## III. Discussion

Although his Complaint is somewhat unclear, the parties appear to agree that Simpson has advanced five counts: (1) a Fourth Amendment unreasonable seizure claim

against Officer McKalips[1] based on the alleged lack of probable cause to arrest[2]; (2) a Fourth Amendment and/or Fourteenth Amendment malicious prosecution claim against Officer McKalips; (3) a state law false arrest claim against Officer McKalips; (4) a *Monell*[3] claim against the City for failure to train its police officers on the proper application and interpretation of the emergency incident area statute, which allegedly caused the false arrest; and (5) another *Monell* claim against the City for failure to train its officers on the proper application and interpretation of the emergency incident area statute, which allegedly caused the malicious prosecution.  Defendants move for summary judgment on all counts and Simpson opposes each part of the motion.  For reasons that will become clear, the court analyzes Simpson's claims in two groups: (a) Counts 1, 3, and 4; and (b) Counts 2 and 5.

### A. Counts 1, 3, and 4

Counts 1, 3, and 4 all turn on whether Officer McKalips had probable cause to perform the arrest.  It is well established that probable cause is an "absolute defense" to a Section 1983 false arrest claim.  *Hurem v. Tavares*, 793 F.3d 742, 745 (7th Cir. 2015).  The same is true for a false arrest claim under Indiana law.  *See Row v. Holt*, 864 N.E.2d 1011, 1016 (Ind. 2007) ("A false arrest requires absence of probable cause.").  Furthermore, Simpson's first *Monell* claim is derivative of his unreasonable seizure

---

[1] For all counts, Officer McKalips is sued only in his individual capacity.
[2] This type of claim is often referred to as one for false arrest.  *See Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 655 (7th Cir. 2012) ("'False arrest' is shorthand for an unreasonable seizure prohibited by the Fourth Amendment.").
[3] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

claim. If the constitutional claim fails on the merits, his *Monell* claim must necessarily fail as well. *See Petty v. City of Chi.*, 754 F.3d 416, 424 (7th Cir. 2014) ("[I]f no constitutional violation occurred in the first place, a *Monell* claim cannot be supported."). Therefore, finding probable cause to arrest for a single crime ends the analysis for Counts 1, 3, and 4. *See Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007) (emphasis original) ("[P]robable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause . . . .").

"[P]robable cause for an arrest exists 'if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime.'" *United States v. Sands*, 815 F.3d 1057, 1062 (7th Cir. 2015) (quoting *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013)). This is a "commonsense, practical question." *United States v. Hill*, 818 F.3d 289, 294 (7th Cir. 2016). At bottom, the officer's belief that the arrestee had committed an offense "need only be reasonable." *Bailey v. City of Chi.*, 779 F.3d 689, 694 (7th Cir.), *cert. denied*, 136 S. Ct. 200 (2015).

Determining whether law enforcement had probable cause to arrest "depends on the elements of the underlying criminal offense." *Neita v. City of Chi.*, 830 F.3d 494, 497 (7th Cir. 2016). Pursuant to Indiana law, "A person who is not a firefighter who knowingly or intentionally refuses to leave an emergency incident area immediately after being requested to do so by a firefighter or law enforcement officer commits a Class A misdemeanor." Ind. Code § 35-44-4-5 (repealed 2012) (current version at Ind. Code § 35-

44.1-4-5).[4]  An "emergency incident area" is defined as "the area surrounding a structure, vehicle, property, or area that is: (1) defined by police or firefighters with flags, barricades, barrier tape, or other markers; or (2) one hundred and fifty (150) feet in all directions from the perimeter of the emergency incident; whichever is greater."  Ind. Code § 35-44-4-2 (repealed 2012) (current version at Ind. Code § 35-44.1-4-2).  Section 5 can effectively be broken down into three elements: a person violates this statute if (1) he is not a firefighter, (2) he refuses to leave an emergency incident area immediately after being requested to do so by a firefighter or law enforcement officer, and (3) he acts knowingly or intentionally.

The court has little trouble concluding that Officer McKalips had probable cause to arrest Simpson for refusing to leave an emergency incident area based on these elements.  First, Simpson does not claim to be a firefighter.  Second, Simpson's own deposition testimony and affidavit establish that he did not *immediately* leave the area despite being repeatedly instructed to do so by law enforcement.  The officers on the porch told him that he needed to leave *twice*, but Simpson did not turn around and walk back home without further incident.  Instead, he called out to the burglary victim two separate times.  Then, after being instructed to leave yet again, he quipped that he was nowhere near the crime scene.  When specifically ordered to move 150 feet away from the home under investigation, Simpson challenged Officer McKalips' authority and began arguing with him.  He even touted his status as "a City-County Council person"

---

[4] All statutes located in Ind. Code § 35-44-4 were repealed and recodified at Ind. Code § 35-44.1-4 on July 1, 2012.

and asserted that he paid Officer McKalips' salary. This conduct satisfies the second element. Lastly, Simpson possessed the requisite intent. He acknowledges that he heard the repeated commands to leave the area. Furthermore, by arguing with Officer McKalips over whether he needed to move any further, Simpson demonstrated that he was acting knowingly and intentionally.

Simpson does not engage in a meaningful discussion of these elements. Rather, he devotes much ink to an argument of statutory interpretation. He contends that Section 5 narrowly applies to emergencies with firefighters present (i.e., emergency scenes with *only* law enforcement officers do not qualify), and submits the following as evidence: (a) a proposed IMPD legal bulletin that states, "The Marion County Prosecutor's Office and the Office of Corporation counsel have determined . . . [t]he term 'emergency incident area' specifically applies to Fire Department action scenes only and does not apply to police action scenes"; (b) testimony from the City's representative in a Rule 30(b)(6) deposition in an unrelated case allegedly establishing that the City reversed its official position on the statute and agreed with the interpretation espoused in the proposed bulletin; (c) deposition testimony from Officer McKalips in this case indicating that after Simpson's arrest, he learned that it was a matter of policy to only enforce the statute when firefighters are present; and (d) in Simpson's state criminal case, the Marion Superior Court found the statute to be ambiguous as to whether it applied to emergency scenes with no firefighter presence, and thus dismissed the charge. Because firefighters were not called to the scene of the reported burglary, Officer McKalips did not have probable cause to arrest Simpson under this statute, or so the argument goes. Simpson

9

also contends that interpreting Section 5 to apply when only police officers are present could raise First Amendment concerns because the public has a right to observe the actions of public officials, including police officers.

Even assuming that Simpson has presented accurate assessments of the evidence and the First Amendment, his argument wholly ignores well-settled rules of statutory interpretation. In Indiana, "the first step is to determine whether the Legislature has spoken clearly and unambiguously on the point in question. When a statute is clear and unambiguous, [courts] apply words and phrases in their plain, ordinary, and usual sense." *Anderson v. Gaudin*, 42 N.E.3d 82, 85 (Ind. 2015) (citation omitted). A statute "is deemed ambiguous and thus open to judicial construction" only if it "is susceptible to more than one interpretation." *Thatcher v. City of Kokomo*, 962 N.E.2d 1224, 1227 (Ind. 2012). Thus, if a court finds no ambiguity, the judicial inquiry is complete. *See Basileh v. Alghusain*, 912 N.E.2d 814, 821 (Ind. 2009) ("Clear and unambiguous statutes leave no room for judicial construction."); *Ind. Dep't of State Revenue v. Horizon Bancorp*, 644 N.E.2d 870, 872 (Ind. 1994) ("An unambiguous statute must be held to mean what it plainly expresses, and its plain and obvious meaning may not be enlarged or restricted. . . . [A] statute which is clear and unambiguous on its face . . . must be applied and enforced as written.") (citations omitted). The text of the law governs even if there are "strong policy or constitutional reasons to construe the statute in some other way." *Brownsburg Area Patrons Affecting Change v. Baldwin*, 943 F. Supp. 975, 986 (S.D. Ind. 1996) (*quoted in Brownsburg Area Patrons Affecting Change v. Baldwin*, 714 N.E.2d 135, 139 (Ind. 1999)).

The court holds that Indiana Code § 35-44-4-5 is unambiguous because the plain language is not susceptible to more than one interpretation. There is nothing in the text of Section 5 to suggest that it only applies when firefighters are present. That limitation is simply not in the statute. Rather, Section 5 makes clear that the command to leave may come from either a firefighter or a police officer. How the City, IMPD, the Marion County Prosecutor's Office, or the Office of Corporation Counsel interpret this statute is of no moment because the plain language is unambiguous. There is no room for judicial construction under these circumstances. But even if Section 5 was unclear, the court's analysis would center on ascertaining and implementing the General Assembly's intent. A particular municipality's or agency's understanding of the law would be given little, if any, weight. The fact that the Marion Superior Court agreed with Simpson's position does not change this conclusion. *See In re Howell*, 27 N.E.3d 723, 726 (Ind. 2015) ("Differing judicial opinions about the meaning of a provision are not conclusive of ambiguity, but they are evidence that an ambiguity may exist."). *See also Frye v. Bowman*, 193 F. Supp. 2d 1070, 1089 (S.D. Ind. 2002) ("[S]tate trial court decisions are not binding on higher state courts, other state trial courts, or this court.").

Reasonable people could not disagree as to whether Officer McKalips had probable cause to arrest Simpson for refusing to leave an emergency incident area. Therefore, Counts 1, 3, and 4 fail as a matter of law. Summary judgment for Defendants on those counts is required.

### B. Counts 2 and 5

In Count 2, Simpson brings a claim for malicious prosecution against Officer McKalips pursuant to the Fourth and Fourteenth Amendments. Defendants advance several arguments in support of summary judgment on this claim, but the court need not address most of them because Simpson does not contest one. Initially, the parties agree that Simpson must proceed only under the due process clause of the Fourteenth Amendment, not the Fourth Amendment. This is problematic because Simpson has not presented a constitutional violation independent of the alleged wrongful arrest. As the Seventh Circuit explained,

> [A] warrantless arrest . . . cannot serve as the basis for a malicious prosecution action. Malicious prosecution provides a remedy for a deprivation of liberty *pursuant to legal process*—but when the arrest takes place without a warrant, the plaintiff only becomes subject to legal process afterward, at the time of arraignment.

*Serino v. Hensley*, 735 F.3d 588, 593-94 (7th Cir. 2013) (citing *Heck v. Humphrey*, 512 U.S. 477, 484 (1994)) (emphasis original). Paraphrasing the *Serino* court, Simpson's warrantless arrest does not count—he must show that he suffered a constitutional deprivation *after* he was arraigned. Yet, he fails to state any kind of post-arraignment liberty deprivation. For instance, he does not allege that he was held without bail or that the state imposed a travel restriction. *Id.* at 594.

Simpson acknowledges that his claim is doomed under the current state of the law in this circuit. However, he essentially argues that *Serino* will not be good law for much longer. In support, he emphasizes that the Supreme Court recently granted certiorari on

this issue. *See Manuel v. City of Joliet*, 590 F. App'x 641 (7th Cir. 2015), *cert. granted*, 136 S. Ct. 890 (2016). The issue in *Manuel* is as follows:

> The question presented is whether an individual's Fourth Amendment right to be free from unreasonable seizure continues beyond legal process so as to allow a malicious prosecution claim based upon the Fourth Amendment. This question was raised, but left unanswered, by this Court in *Albright v. Oliver*, 510 U.S. 266 (1994). Since then, the First, Second, Third, Fourth, Fifth, Sixth, Ninth, Tenth, Eleventh, and D.C. Circuits have all held that a Fourth Amendment malicious prosecution claim is cognizable through 42 U.S.C. § 1983 ("Section 1983"). Only the Seventh Circuit holds that a Fourth Amendment Section 1983 malicious prosecution claim is not cognizable.

*See Manuel v. City of Joliet*, No. 14-9496 (U.S. 2016).

Simpson maintains that the Court is likely to reverse the Seventh Circuit, and therefore this court should defer ruling on Counts 2 and 5 until a decision is handed down. This request is denied for several reasons. Initially, the court notes that despite Simpson's firm belief that the Court will reverse the Seventh Circuit, it might not. The fact that the Seventh Circuit stands alone in its position on this issue does not necessarily mean that it is incorrect. Second, the Court may not even reach the question; it may find that the issue is not properly before it or the appeal may be voluntarily dismissed. Third, it is time for this protracted litigation to come to an end. This case was filed in May 2013, nearly four years ago, to redress an arrest that occurred in June 2012. Further delay would not serve the interests of justice. Most importantly though, this court is required to apply binding precedent. Unless or until the Supreme Court reverses the Seventh Circuit, *Serino* is binding precedent.

Count 2 fails as a matter of law pursuant to *Serino*. Whereas Count 5 is a derivative *Monell* claim against the City, it likewise fails. *See D.S. v. E. Porter Cnty.*

13

*Sch. Corp.*, 799 F.3d 793, 800 (7th Cir. 2015) ("[A] municipality cannot be found liable under *Monell* when there is no underlying constitutional violation by a municipal employee."). Summary judgment for Defendants is required.

**IV. Conclusion**

Therefore, Defendants' Motion for Summary Judgment (Filing No. 86) is **GRANTED**.

**SO ORDERED** this 11th day of January 2017.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.